Jerome A. Giles and Thelma W. Giles, et al., [1] v. Commissioner. Giles v. Commissioner
Docket Nos. 42841-42843.
United States Tax Court
T.C. Memo 1955-189; 1955 Tax Ct. Memo LEXIS 161; 14 T.C.M. (CCH) 742; T.C.M. (RIA) 55189; June 30, 1955
*161 Marvin K. Collie, Esq., 1146 Esperson Building, Houston, Tex., and John G. Heard, Esq., for the petitioners. M. Clifton Maxwell, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income taxes for the years and in the amounts as follows: Name
Year
Amount
5% Penalty
Jerome A. Giles and Thelma W. Giles
1949
$16,681.66
$834.08
1950
17,466.00
873.30
Russell I. Bond and Dessie M. Bond
1949
16,685.88
834.29
1950
16,620.34
831.02
Valerye McLaughlin
1949
9,872.55
493.63
1950
10,941.62
547.08
The issues presented are (1) whether the respondent erred in disallowing a certain percentage of the losses claimed from the operation of an illegal numbers business conducted by the J and F Company, a partnership, for each of the taxable years 1949 and 1950, thereby increasing the distributive share of each petitioner as a partner therein; and (2) whether the respondent properly imposed a negligence penalty under section 293(a) of the Internal Revenue Code of 1939 against the petitioners in each of the taxable years involved. Findings of Fact During the taxable *162 years 1949 and 1950 all of the petitioners were residents of Beaumont, Texas. Petitioners Jerome A. Giles and Thelma W. Giles are husband and wife and filed joint returns for each of the taxable years. Petitioners Russell I. Bond and Dessie M. Bond are husband and wife and filed joint returns for each of the taxable years. Petitioner Valerye McLaughlin is a widow and filed her individual return for each of the taxable years. All of the respective returns were filed with the collector of internal revenue for the first district of Texas. During 1949 and 1950 the petitioners, Jerome A. Giles, Russell I. Bond, and Valerye McLaughlin, were members of the J and R Company, a partnership which operated an illegal numbers business in Beaumont, Texas during such years. A partnership return for each of the years 1949 and 1950 was filed with the collector of internal revenue for the first district of Texas. For convenience the partnership will be hereinafter referred to as the Company. During the taxable years involved the petitioners, Giles and Bond, each had a 38.89 per cent interest and McLaughlin a 22.22 per cent interest in the partnership. The wives of Giles and Bond, and the petitioner *163 McLaughlin, who was the widow of a former partner, had no active participation in the operation of the business. The Company acted as "banker" in the operation of the numbers business. The operations were conducted as follows: Two drawings of numbers were had each day, one for the morning and one for the afternoon. The winning numbers were drawn from a jug for each play. These winning numbers were printed on a slip. Various combinations of numbers could be played and the odds to be paid on such combinations were printed and available to bettors. Between 60 and 70 writers were engaged in accepting bets. Each writer recorded the bet in a book, numbering each play for each drawing starting with the number 1, and continuing consecutively. Two carbon sheets were made of each play, one of which was retained by the writer and the other was given to the bettor. The writer made a report slip with respect to each morning and afternoon play. This slip showed the total amount of money he had received from the customer, from which he deducted 20 per cent as his commission. Where the winning bets were small the amounts were paid by the writer. These payments were designated "hits paid by book" *164 and were deducted by the writer on his report slip. The original slip from the writer's book, together with his report slip and the remaining cash, were put in a bag and given to a field man, an employee of the Company. Upon receiving these sacks from the various writers the field man placed them in a larger sack which he delivered to the Company. The latter then gave the field man a sack which contained printed slips showing the winning numbers of the morning drawing, together with an envelope containing the cash to pay the bettors the writers had been unable to pay out of prior collections. The field man gave these sacks to the various writers and received the writers' sacks containing the data and cash pertaining to the next drawing. The Company processed the sack delivered to it by the field man. Some of the report slips and cash turned in by the writers showed errors. Some were short and others were over. These errors were reconciled and adjusted with the writers in subsequent transactions. A permanent daily summary record was made of the results of each drawing. This record consists of nine separate columns with the following headings: "Cash," "Cash Hits," "Salary," "Misc. *165 Exp.," "Over," "Short," "Hits Paid by Book," "Book," and "Total Write-Up." This permanent record consists of 50 pages, one for each week the Company operated. Each sheet records the results of 12 drawings or 2 each day. The profit or loss was recorded at the end of each week's operation. At the close of the year the permanent record was sent to a certified public accountant and was used by him as the basis for preparing the partnership return. After the results of the drawings were recorded on the Company's permanent records and the errors corrected and reconciled with the writers, the latters' original tickets and report slips were destroyed to avoid their use as evidence in the event of a raid. A summary of the permanent records of the Company for the respective taxable years is as follows: 1949
1950
1. Gross amount wagered
$655,201.26
$701,519.03
2. Share retained by writer 20%
131,040.25
140,303.81
3. Remainder (1 minus 2)
524,161.01
561,215.22
4. Winning wagers: 5. Paid by writer [1]
144,901.07
146,478.69
6. Paid by partnership
273,736.10
299,624.64
7. Total (5 plus 6)
418,637.17
446,103.33
8. Gross income of partnership as per return (3 minus 7)
105,523.84
115,111.89
9. Expenses, as per return
32,009.25
40,083.03
10. Net income as per return (8 minus 9)
73,514.59
75,028.86
11. Percentage of winning wagers to total wagers (7
divided by 1)
63.89%
63.59%
12. Gross receipts (3 minus 5)
$379,259.94
$414,736.53
*166 The gross income of the Company, as determined by the respondent, is as follows: 1949
1950
Receipts per books
$379,259.94
$414,736.53
Paid to winning cus-
tomers
189,629.97
207,368.26
Gross income
$189,629.97
$207,368.27
The respondent allowed only 50 per cent of the cash receipts as amounts paid to winning customers in lieu of the amounts actually shown on the Company's records. The adjustment was explained as follows: "The books do not show the amounts paid winning customers. Available information indicates that no more than 50% was paid to winners." The respondent increased the amount of partnership income reported by the petitioners as follows: 1949
1950
Jerome A. Giles and
Thelma W. Giles
$33,394.93
$35,896.90
Russell I. Bond and
Dessie M. Bond
33,394.93
35,896.91
Valerye McLaughlin
19,078.35
20,507.82
*167 The revenue agent, in making his investigation of the partnership returns for the taxable years involved, visited the office where the Company carried on its operations and observed the manner in which it conducted its business. The fullest cooperation was given to the agent. Each of the partners furnished the agent with a net worth statement which was checked by him. The permanent records kept by the partnership were adequate for the purpose of determining its net income in the respective taxable years in question and the returns filed were in accordance with its books and records. Opinion LEMIRE, Judge: The respondent adjusted the income of the partnership by allowing only 50 per cent of the gross income as a deduction in lieu of the amounts shown by the Company's record to have been paid out to winning customers, and increased the distributive shares of the petitioners accordingly. The respondent accepted without change the amounts shown on the Company's books as cash receipts from the operations of the business in each of the taxable years in question. The petitioners challenge the respondent's assertion of the deficiencies as arbitrary and without authority. It is *168 clear that the sole basis for the respondent's adjustments of the amounts shown to have been paid to winning customers is the lack of underlying data to enable him to determine the accuracy of the partnership records. We are not unmindful that in the conduct of an illegal business such as here involved, the individuals concerned might be less conscientious about the accuracy and completeness of their records than those engaged in legal activities. The fact that the respondent has accepted as correct the gross receipts reflected on the permanent records does not require us to assume that the disbursements are accurately recorded, where the destruction of the underlying data renders it impossible to verify such entries. However, the mere suspicion that the books do not reflect the true income and disbursements does not justfy the use of an average percentage. We are aware that in the numbers business it is not customary to retain the original tickets and report slips of the writers of the bets. While one of the purposes of their destruction might be to avoid payment of the correct tax, the desire to prevent discovery of the illegal operations, as well as the storage and filing *169 problem entailed, might conceivably be other motivating reasons. Since the writers' tickets and report slips record numbers only they would be useless for the purposes of identification. Furthermore, we think, because of their large quantity, use of them for auditing purposes would not be economical. If the operators of such illegal businesses are motivated by a desire to evade tax, false tickets would be as available to them as false entries in the permanent records. In making these observations it is not intended to give approval to the destruction of such records. They should be retained and made available for whatever use the respondent may deem proper. If the records here were shown to be inadequate or incorrect we would not be hesitant in bearing heavily against the petitioners. The evidence here, on the contrary, shows rather persuasively that complete daily entries were made of the two daily plays. The percentage of winning wagers to total wagers was 63.89 per cent for 1949 and 63.59 per cent for 1950. We think it would have been extremely difficult to have so manipulated the daily entries as to achieve such a result. Two of the witnesses for the petitioners were employees *170 of the Company and were engaged in processing the underlying data. Each had a 5 per cent interest in the net operations of the business. It is unlikely that they would be parties to false entries which would be to their personal detriment. Their uncontradicted testimony was forthright and truthful, as also was the testimony of the petitioners, Giles and Bond. The only testimony adduced on behalf of the respondent was that of the revenue agent who investigated the returns. His testimony was likewise credible. He testified that his allowance of only 50 per cent of the cash paid to winning bettors was his own estimate of a reasonable allowance which he felt was justifiable because of the lack of the underlying records to enable him to verify the permanent records. The respondent argues that since the Company enjoyed a monopoly of the numbers business in the City of Beaumont it is reasonable to assume that some part of the cash recorded as paid for winning wagers was in fact pay-offs to the police for noninter-ference. On cross-examination of petitioner Giles, the respondent educed the information that Giles was a friend of the chief of police and visited the latter's office frequently. *171 Such constitutes the only evidence having any bearing on the existence of possible protection payments. Both Giles and Bond emphatically denied that any protection payments were ever made. The respondent's assertion of illegal pay-offs rests upon mere suspicion, which is never a substitute for competent evidence. The respondent further contends that the petitioners have failed to sustain their burden of showing error, since no field man employed by the Company was sworn to testify that he actually distributed the cash given to him to pay the winning customers. We find little merit in this contention. The continuation of the Company's business depended upon its keeping faith with its customers. Obviously, the field man's tenure would be short indeed if he retained funds belonging to winning bettors. The record shows that the same field men served the Company during the taxable years in question and had been employed for a number of years by the predecessor partnership. Upon the basis of the entire record we are convinced that the respondent's assertion of the deficiencies was arbitrary and not authorized, and we so hold. In determining the net operations of the Company for the *172 taxable years involved the respondent made certain other adjustments which are not contested. Since the returns filed by each petitioner clearly reflected the correct respective distributive share of the partnership income for each of the taxable years 1949 and 1950, the negligence penalties asserted under section 293(a) of the Internal Revenue Code of 1939 may not be assessed. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Russell I. Bond and Dessie B. Bond, Docket No. 42842; and Valerye McLaughlin, Docket No. 42843.↩
1. After deducting erroneously reported winning
wagers of
$ 3,470.82
$ 2,822.52 The erroneously reported winning wagers of $3,470.82 for 1949 and $2,822.52 for 1950 were the hits paid by book that were claimed by the writers and which subsequently were disallowed by the Company upon the detailed checking thereof.↩